COMMONWEALTH vs. DANIEL J. WASHINGTON.

Plymouth.   March 7, 1988. — July 11, 1988.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Jury and Jurors. Practice, Criminal,* Examination of jurors. *Evidence,* Credibility of witness.

In the circumstances of a criminal case in which the evidence of guilt presented was not "overwhelming," and the trial was a contest of credibility between the defense and prosecution witnesses, the judge's failure to conduct the colloquy with the defendant mandated by *Commonwealth v. Sanders,* 383 Mass. 637 (1981), to ascertain whether the defendant knowingly and voluntarily consented to the judge's questioning of prospective jurors on the issue of possible racial bias, was prejudicial error requiring that a new trial be held. [772-774]

INDICTMENTS found and returned in the Superior Court Department on August 19, 1985.

The cases were tried before *Allan M. Hale,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Michael R. Schneider,* Committee for Public Counsel Services, for the defendant.

*Mary Ellen O'Sullivan,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. After trial by jury, the defendant, Daniel J. Washington, was convicted on two indictments charging armed robbery. On appeal he alleges prejudicial error in the judge's failure to conduct the colloquy required by *Commonwealth v. Sanders,* 383 Mass. 637, 640-641 (1981), before examining prospective jurors on the subject of possible racial prejudice.[1]

---

[1] Because we conclude that the failure to hold a colloquy requires reversal in this case, and because the other alleged errors are unlikely to arise at a new trial, we do not reach or discuss them.

We agree that the judge should have conducted a colloquy. We reverse.

We summarize the evidence. At approximately 1:30 A.M., on May 26, 1985, the victims, two sisters who are white, were walking home after a Saturday evening of dancing and drinking at a restaurant in Brockton. Taking a shortcut along a dirt path, the young women were heading away from an illuminated intersection when they heard footsteps behind them. They turned and saw a black man holding a gun. The man threatened to kill them if they did not give their pocketbooks to him. He took the pocketbooks and started to run away.

When the robber was about ten to twelve feet away, one of the women yelled, "Hey, Washington, I know you." The robber stopped, squatted, dropped the handbags, and fled. The entire incident lasted less than one minute.

After retrieving their pocketbooks, the sisters went home and reported the incident to the police. Both women claimed to have recognized the robber, who was described as approximately six feet tall, wearing dungarees and an orange hat, as Daniel Washington.

Several police officers immediately went to the defendant's home, which is located less than three-tenths of a mile from the scene of the robbery. The defendant's mother let the police into the house. After speaking briefly with the officers, she went upstairs to get the defendant. The defendant came down wearing only his undershorts. When one of the officers confronted him, the defendant stated, "I didn't do anything. I've been here all night." The defendant was escorted by another officer to an upstairs bedroom to put on some clothes. One or more of the officers directed the defendant to put on a hat; he put on a grey hat. Neither an orange hat nor a gun was found.

The defendant was brought outside to be identified by the victims, who arrived in a police cruiser. A spotlight from the cruiser was trained on the defendant. One of the officers approached the victims and asked them to look at the defendant and "tell [him] if the man that robbed them was there." The women identified the defendant, one of them stating, "Yes. That's who had taken our pocketbooks. That's Daniel Washington."

The women, ages twenty-three and twenty-four, knew the defendant from elementary school. Although he attended the same school, he was not in either sister's class. One sister, however, shared the same sixth grade class with the defendant's brother, Richard Washington. Both women stated that, subsequent to elementary school, they had seen the defendant occasionally at local parks and bus stops. One admitted that she could not remember a specific occasion that she saw the defendant since 1979; the other said she last saw him about one and one-half years before the incident.

At trial, the defendant presented an alibi defense that he was in bed asleep with his fiancée at the time of the robbery. The defendant testified on his own behalf. The defendant's fiancée, his mother, and a family friend all testified as to the defendant's presence at home at the time of the robbery.

The fiancée said she saw the defendant at 11:30 P.M. when the two went to bed. She said she could feel him next to her during the night, and that she never felt him get out of bed. She admitted that she did not see him after 11:30. She also could not remember the defendant being aroused and getting out of bed to speak with the police when they arrived at the house.

The mother and Hollis Griffith, a family friend, stated that they and a third individual were downstairs watching television all evening until the police arrived. According to both witnesses, the defendant, who went upstairs at appoximately 11:30 P.M., would not have been able to leave the house without their seeing him. The mother, however, admitted that she fell asleep or "nodded off" a few times. Only Griffith said that he was awake the entire time.[2] Thus, the defense depended heavily on the credibility of Griffith's testimony to oppose the victims' identification of the defendant.

---

[2] Although Griffith said he was awake, he provided very little other information. During cross-examination he could not describe the location of either the television set or his seat in the living room. Nor could he describe their relation to the stairway and door that allegedly were visible to him all night. He repeatedly gave unresponsive answers to the prosecutor's questions about the interior of the house.

In a further effort to refute the victims' identification and recognition of the defendant, the defendant testified that he had sustained a jaw injury in an automobile accident in 1983 which altered his appearance. Defense counsel also suggested that the victims could have mistaken the defendant for his brother, who shared the same sixth grade class with one of the victims. A photograph of the brother was admitted.

Before trial, defense counsel moved that the judge pose a series of questions to the prospective jurors to determine "whether they are affected by racial bias or prejudice." The inquiry was relevant. The victims are white, and the defendant is black. The key defense witnesses also are black. The judge therefore properly exercised his discretion to grant the motion, see *Commonwealth* v. *A Juvenile (No. 2)*, 396 Mass. 215, 222 n.8 (1985), and questioned the prospective jurors on the issue of possible racial bias.[3] At no point, however, did the judge conduct a colloquy with the defendant personally to "ascertain that the defendant's decision to insist on specific questions regarding racial bias was a knowing and voluntary one." *Commonwealth* v. *Sanders*, 383 Mass. 637, 641 (1981), quoting *Commonwealth* v. *Lumley*, 367 Mass. 213, 217 (1975).

"The rationale for requiring a colloquy between the judge and the accused prior to race-related, individual questioning of prospective jurors is that such questioning raises 'difficult issues of jury psychology and potential injury to the defendant's case' of which the defendant should be apprised. *Commonwealth* v. *Lumley, supra* at 216-217. As we noted in *Commonwealth* v. *Bumpus*, 365 Mass. 66, 67 (1974), specific questioning as to possible racial prejudice among the veniremen may 'be counter-productive and serve to inject racial bias into the trial rather than to remove it.' Therefore, while recognizing

---

[3] The judge posed the questions to the jurors as a group, not individually. Because the defendant agreed to this procedure, and does not challenge it on appeal, we need not determine whether questioning of prospective jurors as to possible racial bias must be done individually in cases involving interracial armed robbery. See *Commonwealth* v. *A Juvenile (No. 2), supra* at 222 n.8. See also *Commonwealth* v. *Sanders*, 383 Mass. 637, 641 (1981). None of the prospective jurors in this case was excused for cause following the questioning on possible racial bias.

that it is the defense counsel who initiates the request for such questioning in most cases, based on a tactical assessment of the value to be derived therefrom, we believe that the decision whether to raise the racial bias issue with prospective jurors should rest ultimately with a fully informed defendant." *Commonwealth* v. *A Juvenile (No. 2)*, *supra* at 222-223.

"The judge's failure to conduct such a colloquy on his own motion was error, and no objection was necessary to preserve the defendant's right of review."[4] *Commonwealth* v. *Rivera*, 397 Mass. 244, 251 (1986). *Commonwealth* v. *A Juvenile (No. 2)*, *supra* at 223-224. Nevertheless, this error "is not grounds for reversal unless the defendant can demonstrate resulting prejudice. . . . The defendant . . . must show that the error 'possibly weakened his case in some significant way so as to require a new trial.'" *Id.* at 224, quoting *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983). We conclude that a new trial is required in this case.

Unlike *Commonwealth* v. *A Juvenile (No. 2)*, *supra*, the present case is not one in which the guilty verdict returned by the jury clearly "can be attributed to the overwhelming evidence of guilt presented." *Id.* at 225. In *A Juvenile*, two victims of an armed robbery saw the perpetrator in mid-afternoon sunlight, and, minutes later, a police officer saw the thief driving the stolen vehicle. *Id.* at 216. In addition, "[t]he defendant was wearing clothing when apprehended that matched the description given by the two witnesses of that worn by the offender. There was evidence of flight as well, and the victim's key ring was found along the path the defendant took when running from

---

[4] The Commonwealth, citing *Commonwealth* v. *A Juvenile (No. 2)*, *supra* at 224, argues in its brief that failure to hold a colloquy personally with the defendant was not error in this case, because the record otherwise indicates that the defendant voluntarily and knowingly acquiesced to the questioning of the jurors. The record does not support the Commonwealth's argument. The bench conference that the Commonwealth points to in the record indicates only *defense counsel's* understanding that race-related questioning "can cut both ways"; it does not reveal the *defendant's* understanding. Moreover, our cases make clear that a defendant's voluntary and knowing consent to race-related questioning of prospective jurors must be shown by a colloquy with the defendant on the record. See *Commonwealth* v. *A Juvenile (No. 2)*, *supra*.

the police officers. Finally, the defendant's exculpatory testimony was uncorroborated." [5] *Id.* at 225.

In the present case, the robbery occurred late at night in an area with limited illumination. Other than the victims, no independent witnesses saw the incident or the robber's flight. When the defendant was arrested, he was at home and not dressed the way the victims had described their assailant. No orange hat was found. No gun was found. The defendant did not attempt to flee from the police. Moreover, three witnesses corroborated the defendant's exculpatory testimony.

The trial was a contest of credibility between the defendant's witnesses and the victims. Credibility of witnesses is an issue peculiarly in the province of the finder of fact. *Commonwealth* v. *Longo, ante* 482, 489 (1988). Unlike *Commonwealth* v. *A Juvenile (No. 2), supra,* the evidence of guilt presented was not "overwhelming"; instead, "conflicting evidence rendered the outcome of jury deliberations uncertain." See *id.* at 225. In these circumstances, we conclude that failure to conduct the colloquy required by *Commonwealth* v. *Sanders, supra,* requires a new trial.

Therefore, the judgments are reversed, the verdicts are set aside, and the case is remanded to the Superior Court for trial.

*So ordered.*

---

[5] In *Commonwealth* v. *Rivera,* 397 Mass. 244 (1986), another case in which overwhelming evidence of guilt rendered failure to hold a colloquy nonprejudicial, the defendant's alibi also was uncorroborated. *Id.* at 247. The defendant in that case was apprehended just minutes after the crime crawling on the roof of a garage near the scene. In addition, there was no suggestion, as in the present case, of a brother or other person whom the victim may have mistaken for the defendant.