COMMONWEALTH *vs.* JAMES JOHNSON.

No. 89-P-953.

Suffolk. February 16, 1990. - March 29, 1990.

Present: PERRETTA, CUTTER, & SMITH, JJ.

Further appellate review granted, 407 Mass. 1103 (1990).

*Practice, Criminal,* Examination of jurors. *Jury and Jurors. Evidence,* Credibility of witness.

In the circumstances of a criminal trial in which the evidence of guilt presented was not "overwhelming," the verdicts returned by the jury rested solely on the uncorroborated identification of the defendant by the victim and her companion, and animosity toward the defendant created by questioning prospective jurors on the subject of racial prejudice may well have been an important factor in the jury's verdicts, the judge's failure to conduct a personal colloquy with the defendant to ensure that his pretrial motion requesting race-related questioning was made knowingly and voluntarily was prejudicial error requiring reversal of the defendant's convictions. [457-458]

COMPLAINTS received and sworn to in the Boston Municipal Court Department on August 3, 1987.

On appeal to the jury session of that court the cases were tried before *Charles R. Johnson, J.*

*Carol A. Donovan,* Committee for Public Counsel Services, for the defendant.

*Lauren Inker,* Assistant District Attorney, for the Commonwealth.

PERRETTA, J. At the defendant's trial on complaints charging him with assault and battery and larceny from the person, the jury returned verdicts of guilty. Because the victim is white and the defendant black, defense counsel requested that the jury[1] be questioned about racial bias. Although the judge obliged defense counsel, he did not engage the defend-

---

[1]See *Commonwealth* v. *Lumley,* 367 Mass. 213, 216-217 (1975), and *Commonwealth* v. *Sanders,* 383 Mass. 637, 641 (1981), explaining the im-

ant in the required colloquy on the matter before putting his questions to the jury. The only question before us on appeal is whether the evidence against the defendant was so overwhelming that the error, the failure to conduct the colloquy, could not possibly have weakened his case in some significant way. Our review of the evidence leads us to conclude that the verdicts rest solely on the uncorroborated identification testimony of the victim and her companion. We reverse.

I. *The Evidence.*

We recite the evidence in some detail. The victim testified that about 10:20 P.M. on July 23, 1987, she and her friend (also a white woman) were walking up Mount Vernon Street in Boston. There were other people walking along the street, and the area was "relatively illuminated" as it was "dusk" and house and street lights were on.

As the two were making their way, the victim was suddenly grabbed from behind "in a choke hold." Another man, whom she subsequently identified as the defendant, began to tear her earrings from her ears, rip a herringbone chain from around her neck, and grab her handbag. The victim's friend was about ten to fifteen feet in front of her, facing her and the two men. As the man tore the victim's jewelry and handbag from her, he told her, "Give me everything you have or I'll kill you" and "to get" her friend back because he also wanted everything that she had. At this point, the friend screamed "Fire," and the men fled.

When asked how long the entire incident lasted, the victim was understandably unable to give any true estimate of time and replied, "I know it was time enough for them to take everything." Asked if she could identify the man who had taken her possessions, the victim made an in-court identification of the defendant.

People in the area responded to the friend's scream and came to the assistance of the women, who had attempted to chase the two men. The victim spoke with the police but could not remember whether they had asked her to describe

portance of the colloquy made mandatory in *Commonwealth* v. *A Juvenile (No. 2)*, 396 Mass. 215, 223 (1985).

her assailants.[2] It was her memory at trial, however, that, irrespective of whether the police had asked her for a description, she believed that her attackers were in their "teens," that they were young. Further, she testified that she had assumed the men drove away in a car, because an un-identified woman, a bystander, gave the police a license plate number that she had written down.

As requested by the police that night, the victim and her friend went to the police station the following morning to look at photographs. Because the officers were then unavaila-ble, the women agreed to return later in the day. The victim obtained a copy of the police report to bring with her to the Registry of Motor Vehicles (Registry) so that she could re-place her license which had been in her handbag.

It appears from the police incident report prepared the night of the crime that the police immediately took action in respect to the license plate number given to them by the un-identified bystander. That report indicates that a "suspect ve-hicle" was involved and that the car was owned by a Jimmy Johnson of Mattapan. Various Registry records introduced in evidence at trial reveal that the Jimmy Johnson who owned the car was born in 1948. That fact does not appear in the incident report, and there is nothing in the record before us which reveals that the victim saw the Registry records prior to trial.

Returning to the police station later that day, the victim and her friend were shown to a room. They sat about ten to fifteen feet apart, and each was given books containing pho-tographs of black men all of approximately the same age. A police officer was seated at a desk, between the women, as they sat looking through their books. "[R]ight away, in the first book," the victim recognized a man depicted in one of the photographs as the man who had taken her jewelry and handbag. She looked no further. She told the officer seated at the desk and gave the book to him. The victim could not re-

---

[2]The police incident report shows that the victim described her assail-ants as two "black males in T-shirts." The report also contains the nota-tion that "witness states the possibility of I.D."

member whether she or the officer closed the book, but she knew that the book was closed when he gave it to her friend.

Upon being given the book, the friend started to go through those photographs. After about ten to fifteen minutes, she selected a photograph and stopped her viewing. The victim testified that her friend selected the same photograph as she had. There were no names on the photographs.

The victim testified that she learned the name of her assailant from the subpoena she received to appear in court on the matter. In the early morning of November 12, 1987, she and her friend went to the Boston Municipal Court. Court had yet to begin, so the victim and her friend went into the courtroom and sat down. The victim testified that she remembered that, as she and her friend sat waiting, someone came into the courtroom and called out, "Is James Johnson here?" No one responded, but minutes later a man came into the courtroom and sat down one row diagonally in front of the women. The victim recognized him as her assailant. The person who had earlier called out his name was defense counsel.

Testifying second, the friend's account of the incident was substantially similar to that of the victim. She did state, however, that as she and the victim had been walking along Mount Vernon Street, the two men who attacked the victim had "passed . . . [them] a couple of times on the street" just moments before the assault.

At the close of the Commonwealth's evidence, the defendant went forward. His sister's testimony was brief: neither her father nor her brother owned a car, and her brother did not have a driver's license.

The defendant testified that he was twenty-three years of age and that he first learned that he had been charged with a crime on, to the best of his memory, September 6th. The police officer who "worked the detail" on the street where the defendant lived and with whom the defendant would make casual conversation told him, "You have a warrant." The defendant went to the police station the next day.

At the police station, the defendant was told that there was a "warrant at Boston Municipal Court" and instructed him to go there. The defendant stated that he then went to the courthouse and identified himself. He was fingerprinted, brought into a courtroom, and given an arraignment date.[3]

Now aware of the charges, the defendant attempted to remember what he had been doing, where he had been, during July, specifically July 23. Because of the passage of time, he could not do so, even after conversations with his friends. The defendant stated that he neither owned a car nor had a driver's license. He denied attacking the victim and taking her possessions.

II. *Discussion.*

Error occurred, and the only question is whether the judge's failure to make inquiry of the defendant " 'possibly weakened his case in some significant way so as to require a new trial.' " *Commonwealth* v. *A Juvenile (No. 2)*, 396 Mass. 215, 224 (1985), quoting from *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983). It is the Commonwealth's position that the guilty verdicts "can be attributed to the overwhelming evidence of guilt presented, rather than to any animosity toward the defendant that might have been created by the race-related voir dire questioning." *Commonwealth* v. *A Juvenile (No. 2)*, 396 Mass. at 225. What makes the case overwhelming, the Commonwealth argues, is that both women selected the same photograph of the defendant and identified him in court.

What makes the case less than overwhelming, in our view, is that the strength of the case rests entirely on the credibility of the victim and her friend: that they selected the same photograph, that they recognized the defendant as soon as he entered the courtroom the morning of November 12, and that he was the assailant. On the other hand, the attack took place at 10:20 P.M., and was of brief duration. The photograph selected by the women was never shown to the jury, and the circumstances of their selection of it were never cor-

---

[3]Although somewhat unclear, the docket entries support the defendant's testimony.

Commonwealth v. Johnson.

roborated by the officer who was in the room with them but not called by the Commonwealth to testify.[4] The evidence concerning the other, much older, James Johnson and his ownership of the "suspect vehicle" added nothing to the Commonwealth's case. The Registry documents and the defendant's testimony on that issue showed that the defendant had no connection with the car. That evidence went unrebutted by the Commonwealth, and any disbelief of the defendant's testimony added nothing to its case. .

We think this case closer to *Commonwealth v. Washington*, 402 Mass. 769 (1988), and *Commonwealth v. Lopez*, 26 Mass. App. Ct. 618 (1988), than to cases such as *Commonwealth v. A Juvenile (No. 2)*, 396 Mass. 215, *Commonwealth v. Rivera*, 397 Mass. 244 (1986), and *Commonwealth v. Horne*, 26 Mass. App. Ct. 996 (1988). In concluding that the Commonwealth's evidence was not "strong enough to overcome the possibility that the verdict[s were] based on racial prejudice," *id.* at 997, we follow the analysis detailed in *Commonwealth v. Lopez*, 26 Mass. App. Ct. at 622: "As in *Washington*, credibility of the witnesses was the main issue in the case. 'Credibility of witnesses is an issue peculiarly in the province of the finder of fact.' *Commonwealth v. Washington*, 402 Mass. at 774. Also see *Commonwealth v. Longo*, 402 Mass. 482, 489 (1988). The jury verdict[s] cannot 'be attributed to the overwhelming evidence of guilt presented . . . .' *Commonwealth v. A Juvenile (No. 2)*, 396 Mass. at 224-225. Rather, animosity toward the defendant created by the race-related questioning may well have been an important factor in the jury's decision. In these circumstances, the failure of the judge to conduct a colloquy was prejudicial error."

*Judgments reversed.*

*Verdicts set aside.*

---

[4]At one point during a partially "inaudible" bench conference, defense counsel indicated a willingness to stipulate that the selected photograph was that of the defendant. However, no such stipulation was ever communicated to the jury. Indeed, in closing argument, defense counsel stressed that the selected photograph was never produced in court.